*669
 
 MODIFIED OPINION ON MOTION FOR REHEARING
 

 ROBERTS, J.,
 

 for the Court.
 

 ¶ 1. The motion for rehearing is granted. The previous opinion of this Court is withdrawn, and this opinion is substituted therefor.
 

 ¶ 2. Eula Mae Fedrick was a resident of the Neshoba County Nursing Home (NCNH) until she died. Ms. Fedrick’s estate filed a wrongful death action against NCNH and other affiliated entities. Additionally, the estate sued Quorum Health Resources, Inc., a non-governmental entity that entered into a management agreement with NCNH. NCNH and Quorum successfully moved for summary judgment on the basis that the estate failed to raise any allegations of negligence within one year of the Mississippi Tort Claims Act’s (MTCA) one-year statute of limitations. The estate appeals and claims that the circuit court erred. On rehearing, we conclude that, based on the Mississippi Supreme Court’s decision in
 
 Caves v. Yarbrough,
 
 991 So.2d 142, 148-49(¶26) (Miss.2008), the claims that Ms. Fedrick may have brought had she not died were filed after the statute of limitations had expired, but the estate’s claims for loss of consortium and its claims related to loss of companionship did not arise until Ms. Fedrick’s death. We therefore grant the estate’s motion for rehearing and withdraw our prior opinion. Accordingly, we affirm the judgment of the Neshoba County Circuit Court in part and reverse and remand in part.
 

 FACTS AND PROCEDURAL HISTORY
 

 ¶ 3. This appeal stems from the alleged wrongful death of Ms. Fedrick. At the time of her death, Ms. Fedrick was a resident of NCNH. NCNH is a subsidiary of Neshoba County General Hospital (NCGH) — -a community hospital owned by Neshoba County. The NCGH Board of Trustees had entered an agreement with Quorum — a for-profit Delaware corporation — regarding the daily management of NCNH.
 

 ¶ 4. Ms. Fedrick’s estate sued Neshoba County and Quorum, among others, in the Neshoba County Circuit Court.
 
 [1]
 
 After numerous years of discovery and other procedural matters that are not pertinent to our present purposes, NCNH and Quorum filed motions for summary judgment. NCNH argued that summary judgment was appropriate because the estate did not raise any allegations of negligence within the MTCA’s one-year statute of limitations. Quorum reiterated that argument and also claimed that it was entitled to protection under the MTCA because it was an instrumentality of NCGH. Further, Quorum argued that Ms. Fedrick’s estate’s claims against it were derivative of the claims against NCGH.
 

 ¶ 5. Ultimately, the circuit court concluded that the estate did not raise any allegations of misconduct within one year of its notice of claim. The circuit court also concluded that the continuing tort doctrine did not apply to the facts of the case. Consequently, the circuit court granted summary judgment in favor of NCGH and Page.
 

 ¶ 6. As for Quorum, the circuit court found that it was an instrumentality of
 
 *670
 
 NCGH. The circuit court also concluded that the claims against Quorum were derivative of the claims against NCGH. Consequently, the circuit court granted Quorum’s motion for summary judgment. Aggrieved, the estate appeals.
 

 STANDARD OF REVIEW
 

 ¶ 7. This Court conducts a de novo review of a circuit court’s decision to grant a motion for summary judgment.
 
 Mantachie Natural Gas Dist. v. Miss. Valley Gas Co.,
 
 594 So.2d 1170, 1172 (Miss.1992). According to Rule 56(c) of the Mississippi Rules of Civil Procedure, a circuit court may grant summary judgment “if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.” A “material” fact is any fact that “tends to resolve any of the issues, properly raised by the parties.”
 
 Webb v. Jackson,
 
 583 So.2d 946, 949 (Miss.1991) (quoting
 
 Mink v. Andrew Jackson Cas. Ins. Co.,
 
 537 So.2d 431, 433 (Miss.1988)). The moving party bears the burden of demonstrating that there is no genuine issue of material fact.
 
 Tucker v. Hinds County,
 
 558 So.2d 869, 872 (Miss.1990).
 

 ¶ 8. Like the circuit court, we are required to view the evidence in the light most favorable to the non-moving party.
 
 Russell v. Orr,
 
 700 So.2d 619, 622(¶8) (Miss.1997). Precedent requires that, like the circuit court, we must be skeptical when considering motions for summary judgment, because it is better to err on the side of denying such a motion.
 
 Ratliff v. Ratliff
 
 500 So.2d 981, 981 (Miss.1986). Additionally, the application of a statute of limitations is a question of law, and we conduct a de novo review of such questions.
 
 Sarris v. Smith,
 
 782 So.2d 721, 723(¶ 6) (Miss.2001).
 

 ANALYSIS
 

 I. WHETHER THE CIRCUIT COURT RESOLVED DISPUTED ISSUES OF MATERIAL FACT WHEN IT FOUND THAT NO ALLEGATIONS OF NEGLIGENCE OCCURRED WITHIN ONE YEAR OF THE NOTICE OF CLAIM.
 

 ¶ 9. The circuit court granted summary judgment based on its finding that Ms. Fedrick’s estate failed to raise any allegations of negligence that occurred within one year of August 17, 2000 — the date the estate provided statutory notice of its claim to NCGH and Quorum. Ms. Fed-rick’s estate claims the circuit court erred. According to Ms. Fedrick’s estate, the circuit court resolved disputed issues of fact when it granted NCGH’s and Quorum’s motions for summary judgment.
 

 ¶ 10. “The Mississippi Tort Claims Act ... provides the exclusive remedy against a governmental entity and its employees for acts or omissions which give rise to a suit.”
 
 McCoy v. City of Florence,
 
 949 So.2d 69, 77(¶30) (Miss.Ct.App.2006) (quoting
 
 Estate of Williams v. City of Jackson,
 
 844 So.2d 1161, 1164(¶9) (Miss.2003)). The MTCA sets forth in part:
 

 All actions brought under the provisions of this chapter shall be commenced within one (1) year next after the date of the tortious, wrongful or otherwise actionable conduct on which the liability phase of the action is based, and not after.... The limitations period provided herein shall control and shall be exclusive in all actions subject to and brought under the provisions of this chapter, notwithstanding the nature of the claim, the label or other characterization the claimant may use to describe it, or the provisions of
 
 *671
 
 any other statute of limitations which would otherwise govern the type of claim or legal theory if it were not subject to or brought under the provisions of this chapter,
 

 Miss.Code Ann. § 11-^6-11(3) (Rev.2002).
 

 ¶ 11. The MTCA also requires that a plaintiff provide prospective defendants with notice of a claim ninety days prior to filing suit.
 
 Id.
 
 Ms. Fedrick died on October 4, 1999. As mentioned, Ms. Fedrick’s estate provided notice of its claim on August 17, 2000. Ms. Fedrick’s estate argues that the circuit court failed to properly consider the affidavits of its experts. In so doing, Ms. Fedrick’s estate focuses on its claim that NCNH and Quorum failed to ensure that Ms. Fedrick received adequate daily nutrition.
 

 ¶ 12. Ms. Fedriek’s estate retained Dr. Michael Baldinger as one of its expert witnesses. Dr. Baldinger’s affidavit stated that according to Ms. Fedrick’s medical records and her chart from NCNH, at her heaviest, Ms. Fedrick weighed approximately 134 pounds. Further, Ms. Fedrick weighed approximately 110 pounds on April 14, 1999.' Ms. Fedrick had a stroke on April 22, 1999. Dr. Baldinger noted that, on April 23, 1999, Ms. Fedrick was a “total care” resident. Presumably, part of “total care” included assistance in eating. Dr. Baldinger’s first
 
 specific
 
 notation of Ms. Fedrick’s treatment was his statement that based on her medical records from April 29, 1999, Ms. Fedrick was unable to feed herself. Dr. Baldinger’s affidavit includes no allegation that NCNH failed to assist her during this time.
 

 ¶ 13. Next, Dr. Baldinger’s affidavit discusses Ms. Fedrick’s medical and dietary history during the month of June 1999. Ms. Fedrick’s records from June 2, 1999, indicate that she was in the restorative feeding program at that time because she was unable to get her food from her plate to her mouth without assistance. Dr. Baldinger also noted that Ms. Fedrick was not chewing her food or swallowing well. On June 4, 1999, Ms. Fedrick refused breakfast and ate half of her lunch. Notes from Ms. Fedrick’s file indicate that she had been eating better in the restorative feeding program. Dr. Baldinger interpreted that statement as an indication that she had been removed from the restorative feeding program. During the month of July, Ms. Fedrick continued to have a poor appetite. Ms. Fedrick was fed lunch in the dining room, and she typically ate 20% of her total daily meals.
 

 ¶ 14. The only reference to anything in the month of August 1999 was Dr. Bal-dinger’s note that, on August 9, 1999, “Ms. Fedrick refused breakfast and stated that she would eat well at lunch but usually that was the only meal she would eat. This note confirms the importance of cue-ing and hands[-]on assistance for Ms. Fed-rick’s nutrition after her stroke in April of 1999. Nonetheless, that assistance was not given.”
 

 1115. Dr. Baldinger next related that, on September 23, 1999, nurses’ notes for that date indicated that Ms. Fedrick was preparing to go to restorative feeding. Dr. Baldinger noted that there was no prior discussion regarding the need for restorative care. Dr. Baldinger’s affidavit reflects that Ms. Fedrick was in the “restorative feeding program” for her breakfast and lunch meals from September 17, 1999, through her death on October 4, 1999. Dr. Baldinger went on to state that “during that 17[-]day period, her dietary intake increased to an average from around 20% to more than 50%. Had her need for additional assistance been recognized in a timely manner, months earlier than it was, it is likely that [Ms. Fedrick’s] weight loss could have been prevented, thus extending her life.”
 

 
 *672
 
 ¶ 16. The circuit court did not interpret that statement as an allegation of negligence. Instead, the circuit court interpreted that portion of Dr. Baldinger’s affidavit as having “approve[d] the placement of Ms. Fedrick in restorative feeding in September of 1999.” Ms. Fedrick’s estate would have this Court interpret those affidavits as having alleged that NCGH and Quorum were negligent on a continual daily basis. However, that is a discussion best left for the following issue, which concerns application of the continuing tort doctrine.
 

 ¶ 17. “A claim of negligence has four elements: duty, breach, causation, and damages.”
 
 Price v. Park Mgmt. Inc.,
 
 831 So.2d 550, 551(¶ 5) (Miss.Ct.App.2002). In order to survive summary judgment, Dr. Baldinger was required to establish a genuine issue of material fact that NCGH and Quorum engaged in tortuous conduct that proximately caused or contributed to Ms. Fedrick’s death. Additionally, that tor-tious conduct must have occurred on or after August 17, 1999, as Ms. Fedrick’s estate provided the statutorily required notice of claim on August 17, 2000.
 

 ¶ 18. The last statement in paragraph ten of Dr. Baldinger’s affidavit states that Ms. Fedrick was in the restorative feeding program from September 17, 1999, through her death on October 4, 1999. Dr. Baldinger opined that: “Had [Ms. Fedrick’s] need for additional assistance been recognized in a timely manner, months earlier than it was, it is likely that [Ms. Fedrick’s] weight loss could have been prevented, thus extending her life.” As previously mentioned, Ms. Fedrick’s estate provided notice of its claim on August 17, 2000. Because the statute of limitations pursuant to the MTCA is one year, any timely allegation of negligence must have occurred on or after August 17, 1999. Dr. Baldinger opined that Ms. Fedrick’s need for additional assistance would have been timely if it had been recognized “months earlier than it was.” While it is unclear just how many months earlier Dr. Baldinger thought NCNH should have recognized Ms. Fedrick’s need for additional assistance, it is undisputed that only one month transpired between August 17, 1999, and September 17, 1999. Even in the light most favorable to Ms. Fedrick’s estate, Dr. Baldinger’s affidavit does not allege any negligent conduct within one year of the notice of claim. Accordingly, there is no genuine issue of material fact regarding whether Dr. Baldinger raised a timely allegation of negligence.
 

 ¶ 19. However, the Mississippi Supreme Court rendered its decision in
 
 Caves
 
 after the parties in this case had submitted their briefs. In
 
 Caves,
 
 the Mississippi Supreme court held that “in applying the statutory language of the MTCA, the statute of limitations for claims thereunder begins to run when all the elements of a tort, or cause of action, are present.”
 
 Caves,
 
 991 So.2d at 147(¶ 22). The supreme court held that it is necessary to “look past the date of the wrongful conduct to the earliest date all of the necessary elements of a tort claim were present, remembering that damages may not manifest until long after the wrongful conduct.”
 
 Id.
 
 at (¶ 21). The supreme court went on to hold as follows:
 

 [C]ases filed pursuant to our wrongful-death statute may involve more than one kind of claim. For instance, in addition to claims the decedent could have brought “if death had not ensued,” there may be individual claims of loss of consortium, society and companionship, estate claims, and insurance subrogation claims. While it is true that the wrongful-death statute requires that all such claims be brought in one suit, each claim is subject to its own statute of limita
 
 *673
 
 tions. The statute of limitations on estate claims does not begin to run until all of the elements of an estate claim are present. The same is true for claims of loss of society and companionship, which may very well not arise until death.
 

 Id.
 
 at 148-49(¶ 26). Ms. Fedrick’s estate requested any and all damages sustained due to the “loss of a personal relationship with [Ms. Fedrick].” More specifically, in a non-exhaustive list, Ms. Fedrick’s estate requested damages for “loss of support, companionship, consortium, attention, guidance, protection, training, cooperation, affection, and love.” Pursuant to
 
 Caves,
 
 we find that, while the claims Ms. Fedrick could have brought had she not died are rendered untimely by application of the one-year statute of limitations, the estate’s claims for loss of society and companionship did not accrue until Ms. Fedrick died. Ms. Fedrick died on October 4, 1999. Ms. Fedrick’s estate provided the statutorily-required notice of claim on August 17, 2000. Accordingly, the estate’s claims for loss of society and companionship were not untimely pursuant to the one-year statute of limitations. It follows that we affirm the circuit court’s decision to grant summary judgment incident to Ms. Fedrick’s individual claims, but to the extent that the circuit court’s decision impacted the estate’s claims for loss of society and companionship, we reverse the judgment of the circuit court. Consequently, the estate’s claims related to loss of society and companionship are remanded to the circuit court’s active trial docket. The remainder of our analysis applies solely to the claims Ms. Fedrick might have brought had she not died.
 

 II. WHETHER THE CIRCUIT COURT ERRED WHEN IT DECLINED TO APPLY THE CONTINUING-TORT DOCTRINE.
 

 ¶ 20. The estate claims the circuit court erred when it failed to apply the continuing-tort doctrine, which would have tolled the statute of limitations. Where there is a repeated injury, the continuing-tort doctrine applies and tolls the statute of limitations, which begins to run on the date of the last injury.
 
 McCorkle v. McCorkle,
 
 811 So.2d 258, 264(¶ 12) (Miss.Ct.App.2001). “A continuing tort sufficient to toll a statute of limitations is occasioned by continual unlawful acts, not by continual ill effects from an original violation.”
 
 Smith v. Sneed,
 
 638 So.2d 1252, 1256 (Miss.1994) (quoting
 
 Stevens v. Lake,
 
 615 So.2d 1177, 1183 (Miss.1993)).
 

 ¶ 21. In our judgment, the continuing-tort doctrine does not apply. As we discussed in the issue above, in his affidavit, Dr. Baldinger stated that “[h]ad [Ms. Fedrick’s] need for additional assistance been recognized in a timely manner, months earlier than it was, it is likely that [Ms. Fedrick’s] weight loss could have been prevented, thus extending her life.” There is no genuine issue of material fact that, even in the light most favorable to the estate, Dr. Baldinger’s affidavit raised an allegation of negligence that accrued “months earlier” than September 17th.
 

 III. WHETHER THE CIRCUIT COURT ERRED WHEN IT FOUND THAT QUORUM WAS AN INSTRUMENTALITY OF NCGH.
 

 ¶ 22. The circuit court concluded that although Quorum was a Delaware Corporation that contracted with Neshoba County to manage NCNH, Quorum was an instrumentality of NCGH and that Quorum was entitled to the “protections, limitations[,] and immunities provided by the [MTCA].” Ms. Fedrick’s estate claims the circuit court erred.
 
 [2]
 

 
 *674
 
 ¶ 23. The MTCA limits the potential liability of governmental entities or employees of governmental entities. Miss. Code Ann. § 11-46-15 (Rev.2002). Governmental entities include “state and political subdivisions” as defined by the MTCA. Miss.Code Ann. § 11 — 46—1(g) (Supp.2009). Pursuant to the MTCA, a “political subdivision” of state government is defined as follows:
 

 any body politic or body corporate other than the state responsible for governmental activities only in geographic areas smaller than that of the state, including, but not limited to[,] any ... community hospital as defined in Section 41-13-10, Mississippi Code of 1972 ...
 
 or other instrumentality thereof,
 
 whether or not such body or instrumentality thereof has the authority to levy taxes or to sue or be sued in its own name.
 

 Miss.Code Ann. § 11 — 46—l(i) (Supp.2009) (emphasis added).
 

 ¶ 24. An instrumentality is “something that serves as an intermediary or agent through which one or more functions of a controlling force are carried out: a part, organ, or subsidiary branch esp. of a governing body.”
 
 Bolivar Leflore Med. Alliance, LLP v. Williams,
 
 938 So.2d 1222, 1228(¶ 16) (Miss.2006) (quoting Webster’s Third New International Dictionary 1172 (3rd ed.1986)). Pursuant to Mississippi Code Annotated section 41 — 13—35(5)(g) (Rev.2009), NCGH, through its Board of Trustees, has the power “[t]o contract ... with any ... corporation ... for the providing of ... services by or to the community hospital ... regarding any facet of the ... management ... or operation of the community hospital or any division or department thereof, or any related activity....”
 

 ¶ 25. In
 
 Bolivar,
 
 the supreme court found that Bolivar Leflore Medical Alliance (BLMA) was an instrumentality of Greenwood-Leflore Hospital (GLH) and reasoned that: (a) it was undisputed that GLH was a community hospital; (b) GLH had a 98% interest in BLMA’s income and losses; (c) GLH had majority control over BLMA’s executive committee; and (d) such control clearly qualified BLMA as an intermediary or agent through which certain functions of GLH are accomplished.
 
 Bolivar Leflore Med. Alliance,
 
 938 So.2d at 1232(¶ 28).
 

 ¶26. A review of the agreement between Quorum and NCGH indicates that Quorum is an instrumentality of NCGH. The agreement between Quorum and NCGH was titled as a “management agreement.” Section 2(a) of the agreement provided that NCGH “through its Board of Trustees (the ‘Board’), shall retain all authority and shall exercise control over the business, policies, operation, and assets of the Hospital, in accordance with the Hospital’s Charter and Bylaws.” That is, NCGH did not abdicate any of its control or authority over its operation or its business.
 

 ¶ 27. Section 2(b) of the agreement provided as follows:
 

 The Board shall communicate, through its minutes, all policies and directives to Quorum and Quorum shall rely on and assume the validity of communications fronyand shall report to, the Board, the Chairman of the Board, or a designee of the Board.
 
 All matters requiring the professional medical judgments shall remain the responsibility of the Hospital’s Board, Medical Staff[] and allied health professionals.
 
 Quorum shall have no responsibility for such judgments, but Quorum shall render advice and information to the Board on medical staff matters and matters requiring medical or professional judgment in order to assist the Board in making informed decisions in such matters.
 
 *675
 
 The relationship between Quorum and the Hospital created by this Agreement is one of principal
 
 and agent.
 
 The Hospital and Quorum are not partners, joint venturers, or independent contractors, and it is agreed that Quorum is acting solely as the agent of the Hospital in performing services to be provided by Quorum hereunder.
 

 (Emphasis added).
 

 ¶ 28. Section 3 of the agreement pertained to Quorum’s duties. Pursuant to the management agreement, Quorum agreed “to perform the administrative services described herein including responsibility for the day-to-day business affairs of the Hospital. Nothing in this Agreement is intended to alter, weaken, displace, or modify the responsibility of the Board for the Hospital’s direction and control as set forth in Hospital’s Charter and Bylaws.” Section 3(a) provided:
 

 Quorum, as agent for the Hospital, shall enforce and administer the personnel policies established by the Hospital in hiring, managing!,] and discharging Hospital employees; provided, however, that matters with respect to professional competency shall be determined with the assistance of the appropriate Hospital or Medical Staff committee.
 

 The remainder of Section 3 provided that Quorum was duty bound to submit a budget to NCGH for “approval, disapproval, or modification.” Further, Quorum was obligated to supervise NCGH’s accounting system, issue bills and collect on accounts, pay NCGH’s “liabilities and obligations,” and generally order medical equipment and supplies. Quorum also agreed to “offer [NCGH] access to volume purchasing agreements in which Quorum may from time to time participate” and submit an annual management plan to the Board for approval.
 

 ¶ 29. Section 3 of the agreement limited Quorum’s authority. Specifically, the agreement provided that Quorum did not have the authority to “enter into or terminate contracts with physicians on behalf of the Hospital,” to “enter into or terminate contracts with outside consultants on behalf of the hospital,” to “purchase capital assets without prior approval of the Board,” to “enter into any leases of capital assets ... without the prior approval of the Board,” to “enter into any leases which extend beyond the then current initial or renewal term of this Agreement without the prior approval of the Board,” or to “negotiate or enter into collective bargaining agreements covering or purporting to cover employees of the Hospital.”
 

 ¶ 30. Section 4 provided that Quorum “shall provide the Hospital with the services of a hospital administrator and a controller, each of whom shall be acceptable to the Hospital on a continuing basis. In addition, Quorum may, with the Board’s permission, provide the service of other hospital management personnel (for example, the chief operating officer).”
 

 ¶ 31. Although Quorum is a subsidiary of one of the largest hospital corporations in the United States, considering the foregoing provisions of the management agreement, it is clear that under the precise circumstances of this case and context of the relationship between Quorum and NCGH, there is no genuine issue of material fact regarding whether Quorum is an “instrumentality” of NCGH. As an “instrumentality” of a community hospital, Quorum “is entitled to the protections, limitations^] and immunities of the MTCA.”
 
 Bolivar Leflore Med. Alliance,
 
 938 So.2d at 1232(¶ 28). This issue is without merit.
 

 IV. WHETHER THE CIRCUIT COURT ERRED WHEN IT FOUND THAT THE CLAIMS AGAINST QUORUM WERE DERIVATIVE OF THE CLAIMS AGAINST NCGH.
 

 
 *676
 
 ¶ 32. Resolution of the issue above renders this issue moot. Because Quorum was an instrumentality of NCGH, it is entitled to the protections of the MTCA— including the one-year statute of limitations. Because Ms. Fedrick’s estate did not raise any allegations of negligence that Ms. Fedrick might have brought had she not died which occurred within one year of the estate’s notice of claim, it is irrelevant whether the claims against Quorum were derivative of those against NCGH.
 

 ¶ 33. THE JUDGMENT OF THE NESHOBA COUNTY CIRCUIT COURT IS AFFIRMED IN PART AND REVERSED AND REMANDED IN PART FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. ALL COSTS OF THIS APPEAL ARE ASSESSED EQUALLY BETWEEN THE APPELLANT AND THE APPELLEES.
 

 KING, C.J., LEE AND MYERS, PJJ., IRVING, GRIFFIS AND ISHEE, JJ., CONCUR. CARLTON, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION. BARNES AND MAXWELL, JJ., NOT PARTICIPATING.
 

 [1]
 

 . Ms. Fedrick's estate also named Marvin Page as a defendant. At the time, Page was the chairman of NCGH's Board of Trustees.
 

 [2]
 

 . Whether NCGH qualifies as a “community hospital’’ is not at issue.